Elizabeth B. MacDonald v. Commissioner. Ruth B. Peyton v. Commissioner.
MacDonald v. Commissioner
Docket Nos. 6245, 6810.
United States Tax Court
1946 Tax Ct. Memo LEXIS 156; 5 T.C.M. (CCH) 516; T.C.M. (RIA) 46149; June 25, 1946
*156 Charles W. Moxley, Esq., 1601 Kanawha Valley Bldg., Charleston, W. Va., for the petitioners. Paul Waring, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These cases, duly consolidated, involve income taxes for the calendar year 1941. Deficiencies were determined as follows: Docket
No.
Petitioner
Deficiency
6245
Elizabeth B. MacDonald
$2,618.11
6810
Ruth B. Peyton
2,276.85
The single error assigned in each case is the failure of the Commissioner to allow deduction of capital loss involved in the disposition of certain capital stock. In addition to evidence being introduced, a stipulation of facts was filed, which we adopt by reference, finding the facts therein set forth, but setting forth in our findings of fact only such portions as are considered necessary to examination of the issue. Findings of Fact Petitioners reside in West Virginia and filed their Federal income tax returns for the taxable year with the collector for the district of West Virginia. On December 15, 1941, Elizabeth B. MacDonald owned 200 shares, and Ruth B. Peyton 150 shares, of the common stock of Hotel Kanawha Co., a *157 corporation. On that date each transferred the above shares, for a consideration of $1.00, to Jean B. Fitzgerald of Charleston, West Virginia. Petitioners are sisters and Jean B. Fitzgerald is their niece. At that time she was about 21 years of age. At the same time Angus MacDonald, husband of Elizabeth B. MacDonald, transferred 50 shares to her for $1.00. Elizabeth B. MacDonald had purchased the 200 shares in 1923 for $20,000 cash, and Ruth B. Peyton purchased her 150 shares in 1923 for $15,000 cash. In their income tax returns for 1941 each claimed a capital loss of 50 per cent by reason of sale of stock, Elizabeth B. MacDonald claiming capital loss of $9,999.50, and Ruth B. Peyton a capital loss of $7,499.50. Deduction of the losses were denied by the Commissioner. The Hotel Kanawha Co. was organized in 1902. The capital stock consisted in the taxable year of 1,750 shares of common stock and 1,750 shares of preferred. Par value of each class of stock was on June 26, 1941, changed from $100 a share to $1.00 a share without effecting any other change in the stock. The company owns and, until October 4, 1940, operated a hotel and equipment in Charleston, West Virginia. On that date *158 the hotel and equipment was leased to Derrickson Hotels, Inc., for a period of five years, with privilege of renewal for five years. The lease was renewed for five years with option for another five years. The lease greatly strengthened the company. It provided that the lessee would spend for improvements $10,000 the first year and $5,000 per year thereafter, and pay a minimum rental of $15,000 plus 25 per cent of all room rentals, and make all ordinary and necessary repairs. It also provided for termination of the lease on sale of the property by the lessor, in which case lessor should reimburse lessee for all expenditures on the property, if sale was made within the first 12 months of the lease, and in case of sale during the second year, should reimburse lessee for full cost of improvements made in that year and 90 per cent of those made in the first year. Later sale required reimbursement of the lessee on a basis of 10 per cent amortization for each year elapsed since improvements were made, and full reimbursement for those made in the year of sale. Prepaid but unearned rental was to be repaid in case of sale of the property. No dividends have been paid on common stock since *159 a 6 per cent dividend on June 1, 1927. On February 1, 1932, the company defaulted on dividends on preferred stock and as of December 15, 1941, dividends on preferred stock had accrued to the extent of $120,968.75. On December 15, 1941, and December 31, 1941, the company had outstanding notes and bonds of $102,000. Some of the bonds and notes were owned by some of the stockholders. The profit and loss statement of the company as of December 31, 1940, and December 31, 1941, showed losses of $12,526.43 and $292.85, respectively, after deduction of depreciation of $4,959.78 and $4,706.01, respectively. Gross receipts (non-inventory) in 1940 were $84,181.32 and cost of operations $55,131.29. Gross sales were $72,612.60 and cost of goods sold $86,348.96. Gross receipts from rentals in 1940 were $22,426.81. For 1941 rents collected were $21,303.80, old accounts collected $420.87, making a total income of $21,724.67. Expenses totaled $22,017.52. For the month of December 1941 the rental received under the lease was $1,983.01. The balance sheet as of December 31, 1940, showed total assets of $632,390.80, including hotel building at $348,945.71, real estate of $50,000, and furniture, furnishings, *160 plumbing and heating, electric fans, and machinery and equipment totaling $177,624.38, making a total of $526,570.09 of depreciables; while for December 31, 1941, the total assets are shown as $630,893.45, though the above items thereof are the same. There have been no judgment suits or receivership against the Hotel Co. Liabilities on the above dates included $175,000 preferred stock and $175,000 common stock. Current liabilities were $54,000 at the end of 1941, consisting of $50,000 bonds issued October 15, 1940, and $4,000 "Rent guarantee - Derrickson Hotel, Inc." Reserve for depreciation was $324,377.25. Liabilities at December 31, 1941, less capital stock were $489,655.53, leaving $141,237.92 net assets (without considering capital stock) out of the $630,893.45 total assets. The "accrued sinking fund" was $53,143.15, at December 31, 1941. The hotel, land and building, was in December 1941 of a value of from $390.000 to $425,000. For the year 1941 Ruth B. Peyton reported $19,572.82 net income in her Federal income tax return; while Elizabeth B. MacDonald reported net income of $15,563.57. Prior to transfers to Jean B. Fitzgerald, Ruth B. Peyton on December 15, 1941, owned 255 *161 shares of common stock, 320 shares of preferred stock, $15,500 bonds, and notes of $6,500, all issued by the hotel company. Elizabeth B. MacDonald owned 254 shares of common, and 75 shares of preferred, no bonds and no notes. Petitioners have a brother, B. B. Brown, an attorney, residing at Charleston, West Virginia. On December 15, 1941, he owned 54 shares of common and 74 shares of preferred of the hotel company stock, and was a director, vice president and secretary-treasurer. He represents by written power of attorney (including his own stock) one-half of the stock, preferred and common. In addition, three other stockholders have indicated that what he did in regard to the hotel company was all right with them. Mrs. Crowley, president of the company from prior to December 17, 1941, is of advanced age, and B. B. Brown has, in effect, managed the company since about the time of the death, about November 1941, of one Ashton. About December 10, 1941, B. B. Brown suggested personally to Ruth B. Peyton, and by letter to Elizabeth B. MacDonald that they might wish to make a sale of Hotel Kanawha Co. stock, and take a tax loss thereon. The suggestion was made partly to save income taxes, *162 partly because he had confidence in Jean B. Fitzgerald that she would use her stock sensibly and for the good of those already in the company. He suggested her as the purchaser of the stock. Elizabeth B. MacDonald in selling thought she was selling to some one who would have the other stockholders' interest at heart, and did not wish to sell to anybody who might make trouble for the other stockholders. She would have sold for $1.00 to anyone else, if she had felt assured that such person would go along and cooperate with the company as she would. One person in the company she might not have sold to, because she thought he would not cooperate. She had never offered the stock for sale. She has never disposed of any other shares. Ruth B. Peyton's transfer to Jean B. Fitzgerald was at the suggestion of her brother, who told her she had an opportunity to take a loss on her income tax return, and she wished to realize such loss. She sold it to realize a loss on income tax. She would not offer the stock to anybody else who would not cooperate. There had been people who had held up proxies and been difficult in many ways. Jean B. Fitzgerald was at the home of her uncle, B. B. Brown, sometime *163 in December 1941, and her aunt, Ruth B. Peyton was there. It was suggested that she buy 150 shares of the hotel stock from Ruth B. Peyton. She replied she would like to think it over. Later she discussed the matter with her father (not a stockholder in the company) and it was explained to her that the stock at some future date might have some value. She agreed to buy. Several days later B. B. Brown came to her home and asked her if she was willing to buy stock from Elizabeth B. MacDonald if she so desired. She said she would. She bought the stock from Angus MacDonald at the suggestion of B. B. Brown, who asked her if she would be willing to buy it. Jean B. Fitzgerald paid for the stock by a check for $1.00 to each of Ruth B. Peyton, Elizabeth B. MacDonald, and Angus MacDonald. On December 17, 1941, a new certificate for 400 shares of stock was issued to her, signed by Mrs. Crowley as president and B. B. Brown as secretary. B. B. Brown personally delivered the certificate to Jean B. Fitzgerald. She endorsed the certificate in blank so it would be negotiable by anyone she might authorize and it was placed in her father's deposit box in a bank in a folder bearing her name. She still *164 retained the stock at date of trial. She has acquired no other stock in the company. Opinion We have here a simple question as to whether or not the transfer of stock by petitioners was a sale justifying deduction of loss. It is entirely clear that the transfer was made for the purpose of taking loss. Though that fact is not of itself reason to deny the loss, it is to be considered as bearing upon the reality of the transaction involved. (February 25, 1946). That the transferee was the niece of the petitioners is also not without significance. The burden is upon petitioners to show error in the disallowance of deductions. In our opinion they have failed to meet that burden. For the stock Elizabeth B. MacDonald received 1/2" a share, Ruth B. Peyton 2/3" a share. If those amounts do not represent, roughly at least, the fair value of the stock, it is apparent that the transactions smack of gift rather than sale. Though it is true that the balance sheets of the company as of December 31 of 1940 and 1941 indicate that there was no value left for the common stock ($141,237.53 net assets as against $175,000 preferred and $175,000 common *165 stock), examination of such balance sheets discloses the depreciable assets (building, machinery, furnishings, equipment, etc.) to be carried at a net of $202,192.84 ($526,570.09 less $324,377.25 depreciation reserve included in liabilities), whereas the evidence is that "land and buildings" had a fair value on December 15, 1941, of from $390,000 to $425,000. B. B. Brown said the property could be bought "somewhere between $350,000 and $425,000," and "a figure of $390,000 is as good as any other", also that his opinion was $390,000. As land is carried at $50,000 in both years, this appears to leave "buildings" at $340,000 to $375,000, (and we assume this includes all depreciable equipment and furniture therein, since both the witness furnishing the figures and the interrogator also referred to "the property"). Therefore the fair value of depreciables appears to be from $137,807.16 to $222,807.16 more than the book value. This amount added to the other book net assets of $141,237.92 gives from $279,045.69 to $364,045.08 to apply against stock indicating the possibility of an amount left for common stockholders as to be disproportionate to the amounts paid to the petitioners, even though *166 we assume that preferred stockholders are entitled upon liquidation not merely to par value, $175,000, but also the $120,968.75 accumulated unpaid dividends. In the absence of proof as to whether they are so entitled, it is apparent that a much larger amount may be available in case of liquidation to common stockholders. We find it impossible, in the light of the evidence, to ascribe to the common stock the merely nominal value contended for by the petitioners as justifying the sale of 200 shares, or 150 shares, for $1.00. Despite petitioner's attempted distinguishment of , the case, in our opinion is applicable here. There the court, after pointing out that one seeking a deduction must point to a statute authorizing it and show that he comes within its terms, and that claim for loss must rest on a transaction entered for profit, went on to hold that, "It is essential to a transaction entered into for profit that the highest and best price be obtained for property sold," and points out that the purchaser of stock was selected not because he would pay the best price obtainable, but because of his close relationship to the seller: *167 * * * It is inconceivable that Evans would have transferred the stock to anyone outside the family on the same favorable terms to the purchaser contained in the annuity contract. Obviously, had Evans given the stock to Adams, he could not hereby have established a loss by the transfer. Yet, under the peculiar terms of the contract, the stock transfer, as actually made by Evans, was hardly more than a gift to Adams with a retention by Evans of a partial interest in the income from the stock for the period of his own or his wife's life. There is nothing in the case from which it could be found that the price for the stock agreed upon by Evans and Adams was the highest and best price obtainable therefor. It is clear here also that selection of the purchaser was actuated by considerations other than price paid. No effort was made to sell to anyone but petitioners' niece. She was considered one who would be cooperative with the other stockholders. Such a transaction does not bear the attributes of a true sale, but rather of a gift, as indicated in , involving a sale at market price, is not helpful here, *168 even though there was no established market. The evidence here altogether fails to convince us that the price obtained was a fair market price, or fair price, but tends to the contrary. , cited by petitioner, in our view, is to be distinguished. There stock of $100 par value as here was sold for $90, or $1.00 per share, and not 1/2" or 2/3" a share, as in the instant case. No family relationship between vendor and vendee appears. We found as a fact that the corporation "had a deficit and its common stock had only a speculative value at most." Such a finding as to speculative value here could not be made on the evidence adduced. That company was at a time of hearing in process of liquidation. Here, the lease made "greatly strengthened the company." Current liabilities were only $54,000. In our opinion the transaction between the petitioners and their niece is not shown to constitute a sale nor to justify deduction of the losses sought. Decision will be entered for the respondent.